**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| DOMINIQUE STOKES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. G-04-0596 |
| | § | |
| LT. HENRY PORRETTO, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Dominique Stokes sued City of Galveston police officers who allegedly beat him at the City jail after he was arrested and took him to a hospital where his stomach was pumped against his wishes.  Stokes also sued the doctor at the hospital who performed the medical procedure.  Stokes alleges that the four officers and doctor violated and conspired to violate his substantive due process, Fourth Amendment, equal protection, and "equal privileges and immunities" rights by pumping his stomach against his will.  Stokes also alleges that the officers used excessive force; that the supervisory officers failed to provide adequate supervision to prevent the constitutional violations; and that the subordinate officers are liable for failing to intervene.  (Docket Entry No. 37, ¶ 27).

The police officers and the doctor have moved for summary judgment, asserting qualified immunity.  (Docket Entry No. 54, 55, 56).  Stokes has responded, (Docket Entry No. 57), and the defendants have replied, (Docket Entries No. 62, 70).  The parties have also challenged each other's summary judgment evidence.  (Docket Entry Nos. 57, 63).  Based on

a careful review of the motions and responses, the record, the applicable law, and oral argument from counsel, this court grants in part and denies in part the motions for summary judgment and sets a status conference for **October 10, 2006, at 5:00 p.m.**, to establish a schedule to resolve the issues remaining in the case.  The reasons for these rulings are set out below.

## I.    Background

Stokes alleges that Officer Michael Gray used excessive force on him at the Galveston City jail after his arrest; that Officers Clayton Pope and Michael Gray, with Sergeant Pedro Alcocer and Lieutenant Henry Porretto, used excessive force on Stokes in the emergency room; and that all four officers and Dr. John Luh were involved in pumping Stokes's stomach against his expressed wishes.  The allegations and evidence relating to each set of allegations is examined below.

### A.    Stokes's Arrest and the Events at the Jail

On October 14, 2002, Officer Michael Gray pulled over the car Stokes was driving. Two of Stokes's friends were in the car with him.  (Docket Entry No. 56, Ex. B at 8–10, 16; Ex. I, at 2).  Gray instructed the two friends to leave and took Stokes into custody on four outstanding municipal arrest warrants.  (Docket Entry No. 54, Ex. B at 8–12).

The summary judgment record shows that Stokes was well known to the Galveston Police Department as a drug user and dealer with a long history of arrests and convictions. Officer Gray testified that he believed that Stokes had drugs in his possession when he was arrested.  (Docket Entry No. 56, Ex. B at 16, 25–26;  Ex. I at 2; Ex. K at 2).  Gray searched

the car Stokes had been driving when arrested, but found no drugs.  At the jail, Gray ordered a strip-search, instructing Stokes to strip to his underwear, pull his boxers down around his thighs, turn away from Gray, and squat.

During this search, Gray testified that he saw Stokes place his hands in the area of his buttocks.  When Officer Gray ordered him to stop, Stokes allegedly replied, "I got hemorrhoids, I got hemorrhoids man."  Officer Gray repeated his instruction and called out for other officers to help because Stokes refused to comply.  (Docket Entry No. 56, Ex. I at 2).  Officer Gray testified that while awaiting backup, he saw Stokes remove a handful of what appeared to be crack cocaine rocks from his buttocks and hold the rocks in his hand. Officer Gray attempted to get Stokes to release what he was holding by striking Stokes's hand with a police baton.  The blow hit Stoke's forearm and had no effect.  Officer Gray saw Stokes place what Gray believed to be crack cocaine rocks into his mouth.  Officer Gray forced Stokes to the floor in an effort to prevent him from swallowing the substance.  A scuffle resulted, during which Officer Gray attempted to use "open hand control and restraint techniques" to prevent Stokes from swallowing.  (*Id.* at 5).  The effort was unsuccessful.  Gray believed that Stokes swallowed the cocaine rocks.  (*Id.* at 2; Docket Entry No. 56, Ex. A at 7–8).  In 2000, during one of Stokes's previous arrests by Galveston police officers, he had his stomach pumped because he had become ill and it was believed that he had swallowed the drugs that were on his person when he was arrested.  (Docket Entry No. 54, Ex. B at 54–56).

Stokes testified that Gray had previously threatened to arrest Stokes on sight, but Stokes does not dispute the validity of the outstanding warrants  and there is, as a matter of

3

law, no basis to find that the arrest was unconstitutional. Stokes admitted that he had been snorting cocaine the night before, but denied that he possessed or swallowed any when he was arrested. (Docket Entry No. 56, Ex. B at 66–67). Stokes agreed that during the strip-search, Gray yelled for other officers to assist because Stokes was putting something in his mouth. (*Id.* at 27). According to Stokes, Officer Gray then hit Stokes with the baton, but on the head, not the forearm, and did so twice, not merely one time. (*Id.* at 27–28, 30, 32). Stokes testified that when Gray hit him with the baton, his hands were on his boxers, which were around his thighs, not near his buttocks or mouth. (*Id.*).

Stokes testified that the blows were so hard that he lost consciousness. The record shows, however, that Stokes had no breaks in his skin, no bleeding from his head or face, and that he did not report a head injury to jail or medical personnel. (Docket Entry No. 56, Ex. I, at 2; Exs. C, D, J, K, L, M, N, dd) Stokes asserts that jail personnel told him that he had a "nice sized knot" on his head. (Docket Entry No. 56, Ex. B., p. 23).

When Stokes regained consciousness, Gray was choking him and two or three unidentified officers were "twisting on [his] legs and standing on [his] ankles." (Docket Entry No. 56, Ex. B at 33). Stokes told the officers that he did not have any drugs. (*Id.* at 21–22, 36–38). During this time, the unidentified officers allegedly continued to twist his legs and ankles. (*Id.* at 22). Stokes testified that Gray referred to him as a "nigger" two or three times during this struggle. (*Id.* at 35). Stokes was "light-headed" from the choking. (*Id.*).

4

The officers moved Stokes to a holding cell.  Stokes asserts that he heard Officer Gray tell two other white officers that "the nigger had put something in his mouth."  (*Id.* at 23).  Stokes asked for his clothing but was given only a pair of shorts.  (*Id.* at 24).

Officer Gray testified that he notified his immediate supervisor, Sergeant Pedro Alcocer, that he believed Stokes had swallowed crack cocaine.  Officer Gray also contacted Galveston County Assistant District Attorney Bill Reed, who advised that Stokes should be taken to the emergency room for medical evaluation and treatment.  Sergeant Alcocer directed Gray to take Stokes to the hospital and assigned Officer Pope to assist.  (Docket Entry No. 56, Ex. I at 3; Ex. K).[1]  Officer Gray told Stokes that "we're going to take you to the hospital and pump your stomach."  (*Id.* at 24).  Stokes was taken to the University of Texas Medical Branch (UTMB) Emergency Room.  (Docket Entry No. 56, Ex. A at 9, 12–13; Ex. B at 38–39).  When Officer Gray told Stokes that he was being transported to the hospital for evaluation and possible treatment, Stokes told Officer Gray that he would resist any attempt to pump his stomach.  Officer Gray notified Sergeant Alcocer of these statements.  (Docket Entry No. 56, Ex. B at 38; Ex. I at 3; Ex. K).  Sergeant Alcocer in turn relayed the reports he had received to his commander, Lieutenant Porretto, including the report of Stokes's statement that he would resist any attempt to pump his stomach.  Sergeant Alcocer asked Lieutenant Porretto to meet them at the hospital.  (Docket Entry No. 56, Ex. L at 2; Ex. K).

---

[1] Stokes objected to Officer Gray's and Sergeant Alcocer's affidavit testimony that Assistant District Attorney Bill Reed told them to take Stokes to the emergency room.  Stokes asserted a hearsay objection.  The testimony is admitted to show that the statements were made and the effect on the officers' state of mind, not to show that the statements were true or not true.  The objection is overruled.

### B.     The Events at the  Hospital

At approximately 7:30 p.m., Gray and Stokes arrived at the UTMB emergency room. During triage, Stokes informed the nurse that he did not want to be there.  In response to the nurse's inquiry as to whether he was allergic to anything, Stokes replies, "yes, ma'am, I'm allergic to everything.  I can't have no medication."  (Docket Entry No. 54, Ex. B at 39) Stokes later admitted that this was untrue; he was not allergic to any medication. (*Id*. at 54). Stokes refused to give his name or other personal information to the triage nurse.  (*Id.* at 39). Gray removed Stokes's identification from his pocket and gave it to the nurse.  (*Id.*).  Stokes was then taken to a small room and placed in a bed behind a curtain.  Officer Gray handcuffed Stokes to the hospital bed.  (Docket Entry No. 54, Ex. A at 16; Ex. B at 39).  A UTMB nurse connected Stokes to a heart monitor, took his vital signs, and attempted to obtain medical information from him.  Stokes did not cooperate with the nurse's attempts to obtain his medical history.  (Docket Entry No. 54, Ex. B at 40).

The record shows that Stokes's initial heart rate reading was 138 beats per minute (bpm) and his blood pressure was 197/100. (Docket Entry No. 54, Ex. C at 2).  Dr. Luh, the resident and attending physician in charge of the hospital emergency room that night, testified that a heart rate over 100 bpm is considered tachycardia and "cause for concern." A normal blood pressure reading is approximately 120/80; any systolic reading near or over 200 and/or any diastolic reading over 100 is "alarming" because of the risk of stroke, heart attack, or endocranial bleeding.  (*Id*.).

6

Stokes continued to insist that he did not want to have his stomach pumped.  (*Id.* at 39–40).  Stokes explained that he was "talking to whoever [he] needed to talk to . . . to not have [his] stomach pumped."  (*Id.* at 40).  Sergeant Alcocer approached Stokes and encouraged him to cooperate without success.  (*Id.*).  It is undisputed that Stokes struggled and flailed on the bed as medical personnel attempted to attach monitoring equipment to his chest and an IV to his arm.  The officers and attending physician testified that Stokes's medical condition could not be evaluated unless he was restrained.  (Docket Entry No. 56, Ex. B at 40, 42; Ex. I at 3; Exs. C, D, J, K, L; Docket Entry No. 57, Ex. A at 52-55).  Medical personnel supplied the police officers with soft cloth ties to secure Stokes's arms and legs to the bed so that he could be examined and his vital signs monitored.  (Docket Entry No. 56, Ex. B at 42–43, 57; Ex. I at 3; Exs. C, J, K, L).  An officer removed the handcuff from Stokes's right hand and secured that hand to the side of the hospital bed with one of the cloth ties.  When the second handcuff was removed, Stokes pulled his left hand and arm away from the bed rail and toward his chest while gyrating his body, making it very difficult to control him.  Police officers were eventually able to tie Stokes's left hand to the bed rail with another cloth.  The officers contended that they used open-hand control and restraint techniques and only as much force as necessary to secure Stokes's second hand to the bed rail.  (Docket Entry No. 56, Ex. I at 3; Exs. J, K, L).  Stokes contends that the officers used more force than was necessary to achieve this result.  (Docket Entry No. 54; Ex. B at 57-59).

The medical staff then used vital-signs monitoring equipment. (Docket Entry No. 56, Ex. I at 4; Exs. Exs. C, D, J, K, L).  After monitoring Stokes's vital signs for a time, the nurse-

in-charge informed the officers that Stokes's heart rate was more than twice the normal rate

and that his blood pressure was dangerously high.[2]  Medical records show that Stokes's heart

---

[2]  Stokes objected to Gray's affidavit testimony describing what the charge nurse said about the readings from the monitoring.  Stokes argued that the nurse was not made available for deposition.  She is not a named defendant or an employee of a named defendant; the objection is overruled.

Stokes also objected to Officer Pope's affidavit testimony that the charge nurse informed the officers of Stokes's dangerously high blood pressure and heart rate.  Stokes contends that Pope's deposition testimony that "I don't remember a nurse encouraging . . ."and "I wasn't listening to any nurse" (Docket Entry No. 56, Ex. F at 40) contradicts his affidavit.   A court considering a summary judgment motion may disregard a nonmovant's affidavit that contradicts, without explanation, previous deposition testimony.  *See S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 136 n. 23 (5th Cir. 1992).  "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy*, 952 F.2d at 266 (quoting *Foster v. Arcata Assocs.*, 772 F.2d 1453, 1462 (9th Cir. 1985)).  Stokes has taken the deposition testimony out of context.  In his deposition, Officer Pope was answering questions about what the officers did to help the nurse by holding Stokes down and trying to get him to open his mouth.  Pope was not answering questions about what he believed Stokes's medical condition was or what the nurse told the officers about Stokes's condition.  The deposition and affidavit are not inconsistent in a way that would lead this court to disregard the affidavit.

Similarly, Stokes argues that Officer Pope's deposition testimony that he was unsure of who supplied the medical information to the officers contradicted his deposition testimony that he did not recall who provided the information.  A careful reading of his testimony does not reveal a contradiction.  In response to the question, "Did it [the information about Stokes's heart rate] come from the doctor?", Officer Pope replied, "I assume it was the doctor, yes."  (Docket Entry No. 56, Ex. F at 41).  He later testified that the information that Stokes could die without a stomach pump "came from medical personnel. I don't remember if it was a doctor or not."  (*Id.* at 41–42).  These statements reflect the chaotic situation at the hospital, with people coming in and out of Stokes's room and efforts to control Stokes's flailing and thrashing.  Officer Pope testified that he recalled receiving the information about Stokes's vital signs from the doctor and the information that Stokes could die from either the doctor, a nurse, or other medical personnel.  This testimony is not so inconsistent as to require this court to disregard the affidavit.

Stokes also objected to Officer Pope's characterization of the stomach pump as a "relatively insubstantial intrusion" as an improper lay opinion.  This statement is admissible as evidence of Pope's understanding of the procedure.  This objection to Officer Pope's testimony is also overruled.

Stokes also objected to Sergeant Alcocer's testimony about the medical information he received at the hospital.  Like Officer Pope, at his deposition, Sergeant Alcocer was unable to recall specifically whether a doctor, nurse, or other member of the medical staff told him that Stokes had an elevated heart rate.  (Docket Entry No. 56, Ex. G at 23–24).  This testimony is consistent with  his affidavit testimony, "Hospital staff stated that Stokes'[s] heart rate was dangerously high and it was obvious that hospital staff had serious concern for Stokes'[s] safety. . . . " Stokes's objection  to Sergeant Alcocer's testimony is overruled.

rate ranged from 108 to 150 beats per minute and his blood pressure ranged from 197/100-242/80.  (Docket Entry No. 54, Ex. D at 2; Docket Entry No. 56, Exs. C, D, H, I, J, K, L).

Dr. Luh saw Stokes at approximately 7:30 p.m.  (Docket Entry No. 54, Ex. D at 2).  A police officer or hospital employee told Dr. Luh that Stokes had swallowed a handful of crack cocaine.  (*Id.*).  Dr. Luh testified that Stokes denied swallowing cocaine, but  Dr. Luh did not believe Stoke's denial because his vital signs, demeanor, and behavior were consistent with cocaine ingestion.  (*Id.*).  Stokes's blood pressure and heart rate were elevated and rising.  Dr. Luh determined that Stokes had most likely ingested crack cocaine and needed to have his stomach pumped to prevent further absorption of the drug into his blood stream.  (*Id.*).  Dr. Luh told Stokes that he needed to have his stomach pumped, and Stokes initially consented.  (*Id.* at 2-3).

At 7:45 p.m., UTMB staff twice attempted to perform the gastric lavage.  Stokes's heart rate had climbed to approximately 140-150 bpm.  Stokes became verbally abusive and combative with the hospital staff, screaming at them and threatening them, and continued to thrash about on the bed.  The officers attempted to restrain him, but the soft restraints were not adequate to immobilize Stokes.  (Docket Entry No. 56, Ex. B at 73–74; Ex. I at 4; Exs. C, J-L).  When the nurse attempted to draw blood for additional diagnostic tests, Stokes refused to allow her to do so.  (*Id.* at 42–43; Ex. I at 4; Exs. J, K, L).  The police assisted in restraining Stokes and the nurse collected a blood sample.  (Docket Entry No. 56, Ex. B at 42–43; Ex. I at 4; Exs. D, J, K, L).  Sergeant Alcocer moved to the head of the bed and began pressing behind Stokes's ears, trying to make Stokes swallow the tube for the lavage.  The nurse

instructed the officers where to apply pressure.  Officer Gray stood to Stokes's right and put

his fist under Stokes's chin, pushing with his knuckles to make Stokes open his mouth.

(Docket Entry No. 54, Ex. B at 43–44).  During the struggle, Stokes's mouth began to bleed.

The nurse instructed the officers to "hold up.  His mouth is bleeding, I don't know if you

should keep doing this."  (*Id.* at 45).

The parties dispute the extent of the force used to enable the nurse to administer the

medical procedures.  Stokes testified that Lieutenant Porretto climbed onto the bed, got on top

of Stokes, and pressed his knees into Stokes's stomach and groin.  Stokes testified that while

Lieutenant Porretto was on top of Stokes, Sergeant Alcocer grabbed Stokes's genitals.

(Docket Entry No. 56, Ex. B at 44).  Sergeant Alcocer denied grabbing Stokes's genitals,

stating that it was Lieutenant Porretto who did so while he was straddling Stokes.  (*Id.* at

26–27).  Officer Gray agreed that it was Lieutenant Porretto who grabbed Stokes's genitals,

testifying that Porretto had reached behind while straddling Stokes and grabbed him by the

testicles because Stokes had tried to "eject" Porretto.  (Docket Entry No. 54, Ex. A at 15, 25;

Docket Entry No. 56, Ex. 1, ¶ 12).[3]  Porretto testified that he grabbed Stokes's genitals only

because Stokes was pushing him onto the floor.  (Docket Entry No. 56, Ex. B, at 60–62, 89;

Ex. I at 4; Exs. C, J, K, L).  Officer Pope testified that he did not see anyone grab Stokes's

---

[3] Stokes objected to this testimony on the ground that it was inconsistent with Officer Gray's earlier
deposition testimony that "I saw Lieutenant Porretto grab in the area of his testicles."  (Docket Entry No. 54
at 4).  There is no contradiction between Officer Gray's deposition testimony and the later affidavit that
would lead this court to disregard the affidavit.  The objection is overruled.

genitals but did hear Stokes yelling.  Stokes testified that he did not see Porretto grab his genitals, but acknowledged that it was possible. (*Id.* at 61-63).

According to Stokes, when Lieutenant Porretto got off him, Officer Pope grabbed Stokes's fingers and began to bend the entire hand back as another officer held Stokes's other hand.  (Docket Entry No. 54, Ex. B at 44).  Officer Pope testified that he may have inadvertently grabbed Stokes's fingers but denied any deliberate or forcible bending of the hand. (Docket Entry No. 54, Ex. F at 17–18).

At 8:15 p.m., hospital staff made another attempt to perform the gastric lavage. At that time, Stokes's heart rate was between 129 and 139 bpm and his blood pressure had risen to 203/75.  Stokes continued to resist, physically and verbally.  The nurse told the officers that there was a type of medicine that would briefly put Stokes to sleep and immobilize him so that the procedure could easily be done.  (*Id.*).  Dr. Luh reentered the room at this time.  He discussed the procedure with Stokes, stressing the importance of preventing the absorption of any more cocaine into his system.  (Docket Entry No. 56, Ex. C at 5).  Stokes did not consent.  Dr. Luh then left the room.  (Docket Entry No. 56, Ex. D at 3).  At some point, Lieutenant Porretto told Dr. Luh that because of Stokes's arrest status and irrational behavior, the City was responsible for making any decisions about his emergency medical needs.  (*Id.* at 11–12; Docket Entry No. 56, Ex. I at 4).

Shortly before 8:40 p.m., Stokes's vital signs had not improved.  Dr. Luh testified that he believed that Stokes could die unless the lavage was performed.  (Docket Entry No. 54, Ex. D at 4).  Dr. Luh stepped out of the room and informed the police of the growing urgency of

11

the need to treat Stokes for cocaine ingestion.  After a brief discussion, Lieutenant Porretto

told Dr. Luh that if the doctor did not perform the gastric lavage, the police would arrest him

and take him to jail. (*Id.* at 4; Ex. E at 17).  Lieutenant Porretto told Dr. Luh that he would

sign any documents necessary to show that he had authorized the medical care on Stokes's

behalf and indicated that the other officers would sign as witnesses.  (Docket Entry No. 56 at

12; Ex. I at 5).

According to the medical records,  Stokes again refused the gastric lavage at 8:40 p.m.

and continued to yell and struggle.  Medical personnel told Stokes that he would be given a

paralytic drug if he continued to resist.  (Docket Entry No. 56, Ex. B at 45–46; Ex. I, at 5; Exs.

C–D, H, J–L).  Lieutenant Porretto gave the order to intubate Stokes and pump his stomach.

(*Id.*).[4]  When Stokes continued to struggle, Dr. Luh administered Versed, a sedative.  Shortly

after the Versed took effect, Stokes was administered succinylcholine, a paralytic, to permit

the hospital staff to insert the tube and perform the gastric lavage.  (Docket Entry No. 54, Ex.

D at 4).   Stokes was sedated and paralyzed for approximately ten minutes during the

procedure and was fully awake and alert by 9:00 p.m.  (Docket Entry No. 54, Ex. C at 6).  Dr.

Luh confirmed that Stokes was administered 100 mg of succinycholine and intubated from

8:45 p.m. to 8:50 p.m., although the nurses' notes indicate that Stokes was intubated from

8:50 p.m. to 9:10 p.m.  Dr. Luh testified that he did not know which entry was correct.  (*Id.*

---

[4] According to the medical records, the order was from both Alcocer and Porretto.  (Docket Entry
No.  57, Ex. A at 73, 75).  Stokes objected to certain medical opinions offered by Lieutenant Porretto in his
affidavit.  It is clear that Lieutenant Porretto is not qualified as a medical expert.  His testimony about medical
procedures is admitted only to show his understanding of Stokes's medical condition and what information
was available to him.  The objections to Lieutenant Porretto's testimony are overruled.

at 30, 32–36).  Dr. Luh testified that Stokes was paralyzed for a total of six minutes.  (*Id.* at 13–14).

The most prominent side effects of succinycholine are temporarily elevated potassium, headaches, blurred vision, and disorientation.  (Id. at 14–15).  While Stokes was recovering from the procedure, he was approached by Rachel Washington, a former neighbor who worked for the Texas Department of Criminal Justice.  Washington asked Stokes whether he was all right and whether he wanted her to call his relatives.  (Docket Entry No. 57, Ex. K, at 8, 16–17).  In her deposition, Washington testified that Stokes was sweating and that there were no medical personnel in the room at the time, although a police officer was present.  (*Id.* at 17).  Stokes gave his grandmother's telephone number to Washington, and she left the room.  (*Id.* at 18–19).

Robert Blake, a UTMB registration interviewer, also testified about his observations of Stokes.  (Docket Entry No. 56, Ex. AA at 7).  Blake first saw Stokes when he arrived at the hospital with the officers.  Stokes was handcuffed.  (*Id.* at 10).  Blake overheard Stokes explaining that he did not want medical treatment.  (*Id.* at 11).  Blake then went about his business, handling another assignment.  When Blake returned to the area of Stokes's  room, he heard noises coming from that room.  Blake testified that he approached the room and saw Stokes in restraints, on the bed, with a Hispanic officer on top of him, whispering in Stokes's ear and striking him violently in the groin area and about his chest.[5]  (*Id.* at 19).  According

_____

[5] Sergeant Alcocer was the only Hispanic officer at the scene that evening.  (Docket Entry No. 54, Ex. G at 4–5).

to Blake, a white male officer and a female nurse or technician were also in the room. (*Id.* at 20–21). Stokes did not say anything or move. He appeared unconscious. (*Id.* at 22–23).

Stokes was discharged from the hospital into the custody of the Galveston police at approximately 11:00 p.m. (Docket Entry No. 54, Ex. C at 6). The contents of Stokes's stomach were pumped into a bag and taken by the police. (Docket Entry No. 54, Ex. A at 28–29). Gray performed a field test on some small solid pieces he recovered from Stokes's stomach contents. The test showed a positive reading for the presence of cocaine, but most of the stomach contents were not preserved for testing and not used in any proceeding. (Docket Entry No. 56, Ex. I at 5–6).[6]

Gregory Rekoff was the supervisor of the emergency services trauma center that night, but was not on duty. (Docket Entry No. 57, Ex. I, 8–12). In his deposition, Rekoff explained that his duties included evaluating and disciplining staff as well as acting as a facilitator and advocate for patients. (*Id.* at 9). Rekoff talked to the staff after the incident. (*Id.* at 16–17). Rekoff testified that Neta Corley, the nurse on duty and in the room with the officers, was suspended for her role and conduct. (*Id.* at 18–19). Rekoff testified that the staff were upset over Stokes's treatment and the fact that he had been intubated and his stomach evacuated against his expressed wishes. (*Id.* at 19, 21, 45). Rekoff stated that in his judgment, the

---

[6] Stokes objected to Officer Gray's testimony about the results of the stomach pumping. Officer Gray's affidavit testimony that he "did not realize at the time that the majority of the cocaine [in Stokes's stomach] had likely been converted into a liquid after being subjected to gastric fluids and, therefore I obviously did not adequately preserve the liquid sufficiently for later testing at the lab," (Docket Entry No. 56, Ex. I, ¶ 22), is neither hearsay nor improper exert testimony by a lay witness. This testimony is not admitted for its truth or as an opinion outside Officer Gray's admittedly limited knowledge of this medical procedure. Stokes's objections to Officer Gray's testimony are overruled.

hospital staff did not adequately protect Stokes from receiving treatment against his will.  (*Id.* at 23–25).  Rekoff explained that Dr. Luh was a young physician who had little experience in the emergency room when the incident occurred.  (*Id.* at 25–26).[7]

###     C.     The Allegations and Defenses

Stokes alleges that Officer Michael Gray used excessive force at the jail; that Officers Clayton Pope and Michael Gray, Sergeant Pedro Alcocer, and Lieutenant Porretto used excessive force in the hospital; and that all four officers and Dr. John Luh violated  and conspired to violate Stokes's substantive due process, Fourth Amendment, equal protection, and "equal privileges and immunities" rights by pumping his stomach against his will.  Stokes also alleges that Sergeant Porretto and Sergeant Alcocer failed to provide adequate supervision and that Officers Gray and Pope are liable for failing to intervene to prevent the constitutional violations.  (Docket Entry No. 37, ¶ 27).[8]

---

[7] Defendants objected to Rekoff's deposition testimony.  Rekoff worked at UTMB as the emergency room nursing supervisor.  Although the officers are correct that Rekoff lacked personal knowledge about the specific events that took place at the hospital on the night of the incident because he was not working, parts of his testimony are admissible.  Rekoff testified, for example, that he had personal knowledge that Neta Corley, the nurse in charge of Stokes's treatment, was suspended for her conduct that evening. (Docket Entry No. 57, Ex. I at 18).  Rekoff also provided testimony about his personal knowledge of patients needing stomach pumps to remedy drug ingestion.  The officers challenged Rekoff's opinion that a physician should not pump a nonconsenting patient's stomach as long as the patient is "awake, alert and oriented."  (*Id.* at 24).  The officers argued in passing that Rekoff is not qualified to render this opinion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 570, 592–93 (1993).  To the extent Stokes invokes Rekoff's opinion as a legal standard for the constitutional limits on involuntary medical procedures, the objection to the lack of personal or professional expertise under Rule 702 of the Federal Rules of Evidence and relevance is sustained.

[8] Stokes also initially alleged that the search and seizure in the jail violated his rights, but has dropped that claim in the summary judgment briefs.  Stokes also limited certain claims to certain defendants.

15

The defendants have filed motions for summary judgment, asserting qualified immunity. (Docket Entry Nos. 54–56). Dr. Luh claims that his actions were objectively reasonable in light of the knowledge and information available to him when he made the decision to pump Stokes's stomach. (Docket Entry No. 54). The police officers contend that Stokes was not subjected to force excessive to what was reasonably needed to restrain him at either the jail or the hospital, that the medical treatment was lawful, and that the officers' actions were objectively reasonable. (Docket Entry No. 67). Each cause of action, and the defendants' qualified immunity motions, are examined below.

## II.    The Legal Standards

### A.      The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56. Rule 56(c). The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln General Ins. Co. v. Reyna*, 401 F.3d (5th Cir 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary

judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. Exxonmobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx. at 800. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to

17

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting

*Celotex*, 477 U.S. at 322).

### B.        The Qualified Immunity Standard

"Qualified immunity protects 'government officials performing discretionary

functions from civil damages liability as long as their actions could reasonably have been

thought consistent with the rights they are alleged to have violated.'" *Fitts v. Crain*, 108 Fed.

Appx. 865, 868 (5th Cir. 2004) (quoting *Enlow v. Tishomingo County, Miss.*, 962 F.2d 501,

508 (5th Cir.1992)).; *see also Anderson v. Creighton*, 483 U.S. 635, 637 (1987); *Gutierrez

v. City of San Antonio*, 139 F.3d 441, 445 (5th Cir. 1998); *Colston v. Barnhart*, 130 F.3d 96,

99 (5th Cir. 1997).  Evaluating qualified immunity is a two-step process.  A court must first

determine whether the plaintiff has alleged a violation of a clearly established constitutional

or statutory right.  *See  Siegert v. Gilley*, 500 U.S. 226 (1991). "If the plaintiff does so, the

court must then assess whether the defendant's conduct was objectively reasonable in light

of clearly established law." *Fitts*, 108 Fed. Appx. at 868 (quoting *Nunez v. Simms*, 341 F.3d

385, 387 (5th Cir.2003)).  A right is clearly established if its contours are "sufficiently clear

that a reasonable official would understand that what he is doing violates that right." *Wooley

v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir. 2000) (internal citations omitted);

*Brosseau v. Haugen*, 542 U.S. 194, 198–99 (2004).  The objective reasonableness of the

official's conduct is measured with reference to the law as it existed at the time of the

conduct in question.  *See Blackwell v. Barton*, 34 F.3d 298, 301 (5th Cir. 1994).  "The subjective intent of the public official is irrelevant, and the official's knowledge of the relevant law need not rise to the level of a 'constitutional scholar.'"  *Swyden*, 139 F.3d 464, 466 (5th Cir. 1998) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 815–17 (1982)).

"Qualified immunity 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'"  *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  The plaintiff bears the burden of proving that a government official is not entitled to qualified immunity.  *See, e.g., Bennett v. City of Grand Prairie*, 883 F.2d 400, 408 (5th Cir.1989).

## C.      Excessive Force

To prevail on an excessive force claim, a plaintiff must show (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.  *Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994).  Although "significant injury" for excessive force claims is no longer required, the injury must be more than *de minimis*.  *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).  To determine the objective reasonableness of an officer's use of force, a court must "pay 'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight.'"  *Gutierrez v. City of San Antonio,* 139 F.3d 441, 447

(5th Cir.1998) (alteration in original) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *see also Tarver v. City of Edna*, 410 F.3d 745 (5th Cir. 2005). "For example, the plaintiff in *Williams* alleged that he received the same physical injury (choking) in two separate encounters. The choking that occurred during an attempted (legal) search of the Plaintiff's mouth was deemed not a cognizable injury but a second identical choking that was committed in the absence of any valid reason to continue the physical contact was a potential injury that precluded summary judgment." *Scott v. Hanson*, No. Civ.A. 04-0460-P, 2006 WL 1523189, at *4 (W.D. La. May 26, 2006) (citing and discussing *Williams*, 180 F.3d at 704).

## III.   Analysis

### A.    The Events at the City Jail

It is undisputed that when the alleged use of force occurred, Stokes was in the lock-up, in the process of being strip-searched. He was not attempting to escape or to injure an officer. The parties otherwise offer divergent versions of what occurred at the lock-up.

Stokes testified that during the strip search, Officer Gray used his baton to hit Stokes twice on the head as he was complying with the order to lower his shorts and squat. Although Stokes testified that he was not resisting the order when Gray used the baton, Stokes admitted that Officer Gray shouted that Stokes was "putting something in his mouth" just before hitting him. Stokes testified that Officer Gray hit him despite the fact that his hands were at his sides, on his shorts, not behind him or at his mouth, and then choked him.[9]

---

[9] Stokes has not sued any of the unknown officers who allegedly participated in the use of force.

Although Stokes disputes that he swallowed drugs at the lock-up, he does not dispute that he had so on a prior arrest.  Nor does Stokes dispute that Gray expressed his belief that Stokes was trying to swallow something before striking him.

Officer Gray admitted that he used force but asserted that he did so to prevent Stokes from swallowing what Gray believed to be rocks of crack cocaine because he saw Stokes take something from his anus and put it in his mouth.  Officer Gray testified that he hit Stokes on the arm, not the head, to get  him to drop the drugs that he had removed from his anus and was placing in his mouth.  Gray testified that he and other officers then struggled unsuccessfully with Stokes to try to get him to spit out the cocaine before  he swallowed it. (Docket Entry No. 54, Ex. A at 11–12).

This court must accept Stokes's testimony that he was hit on the head for the purpose of deciding the summary judgment motion.  Officer Gray points to the photographs taken in the jail shortly after the alleged incident to support the argument that Stokes did not sustain an injury to his head.  Stokes agreed that the blows did not break the skin or cause any bleeding.  He testified, however, that the blows to the head caused him to  lose consciousness briefly and raised a large bump that jail personnel noticed and that lasted for an extended period.  He also testified that Gray choked him after he regained consciousness.

In *Williams*, the Fifth Circuit also considered the use of force by a police officer who suspected that a detainee might have been holding crack cocaine in his mouth.  The detainee alleged that the officer choked him twice, once to get him to spit out the substance, and a

second time after the detainee threatened to report the officer.  The incident caused the detainee to become dizzy and to be unable to breathe.  *Williams*, 180 F.3d at 703-704.  The Fifth Circuit accepted these allegations as true in reviewing the grant of summary judgment based on qualified immunity.  *Id.*  The court held that as to the first choking, which occurred during a search of the detainee's mouth, the alleged injury – fleeting dizziness and temporary loss of breath – did not rise to the level of a constitutional violation.  The second choking, however, was a cognizable injury because the force was allegedly not part of a legitimate search, but  maliciously inflicted in retaliation for the threat to report the officer.  *Id.*  The court explained that the difference resulted from the different context in which the force was deployed.  *Id.*   In the present case, accepting Stokes's allegations as true, both the blows from the baton and the choking occurred immediately after Gray yelled that Stokes was trying to swallow drugs during a strip-search.  The record shows that Gray used the baton to try to get Stokes to drop the drugs before putting them into his mouth, then choked him to try to get him to spit out the drugs.  Unlike the second choking in *Williams*, both the use of the baton and the choking occurred during an attempt to prevent Stokes from swallowing drugs.  Under *Williams*, the fleeting effects of the choking, administered in order to prevent Stokes from swallowing drugs, do not rise to the level of a cognizable injury. 180 F.3d at 704.  The blows to the head, however, are a closer question.  *See Tarver*, 410 F.3d at 752–53 (holding that injuries from handcuffing are *de minimis,* but that head injuries suffered from an officer slamming a police car door into the plaintiff's head meet the injury requirement); *Scott*, 2006 WL 1523189 at *4 ("There are many forms of force, such as choking, use of

22

electric shock or beating a person on the head with a phone book, that leave no lasting marks or visible injuries but may nonetheless support an excessive force claim."). Stokes's testimony that Officer Gray used his baton to hit him twice on the head, so hard that he lost consciousness and suffered a lasting bump, precludes summary dismissal on the basis that there was no injury.

The next step in the analysis is to determine whether using a baton to strike Stokes twice on the head to get him to drop drugs that were believed to be in his hand was excessive to the need and was objectively unreasonable. Officer Gray contends that he used reasonable force because he only struck Stokes once on the arm with the baton. Officer Gray does not argue, and the record does not show, that hitting Stokes twice on the head, hard, with a baton, was objectively reasonable under the circumstances. Instead, Officer Gray contends that Stokes's testimony that he was hit on the head is not credible. Whether Stokes is exaggerating the injuries he received or the amount of force used cannot be resolved at the summary judgment stage. "Any credibility determination made between the officers' and [the plaintiff's] version of events is inappropriate for summary judgment." *Tarver*, 410 F.3d at 753, *citing Bazan v. Hidalgo County*, 246 F.3d 481, 492 (5th Cir. 2001) (holding a material dispute about a witness's credibility should not be resolved on summary judgment). "If the evidence supports Plaintiff's theory at trial and the jury finds him credible, a reasonable juror could conclude that his injuries resulted directly and only from the force used by the . . .

23

Defendant[ ]." *Luevano v. Peralta*, No. EP-04-CA-0431-FM, 2005 WL 1750381, *3 (W.D. Tex. July 25, 2005).

The record discloses genuine issues of disputed fact material to determining whether Officer Gray is entitled to qualified immunity on Stokes's excess force claim. There are disputed issues as to whether Officer Gray hit Stokes twice on the head hard with a baton, as Stokes contends, or once, on the arm, as Gray contends. Because of this disputed material factual issue, Officer Gray's motion for summary judgment as to Stokes's claim that the officer used excessive force at the jail is denied as to the alleged blows to the head and granted as to the alleged choking and scuffling.

### B.      The Events at the Hospital

Stokes contends that all four officers used excessive force in assisting hospital personnel in pumping his stomach. Stokes asserts that the stomach-pumping procedure was itself excessive force that violated the Fourth Amendment and an intrusion that violated his substantive due process and equal protection rights. Stokes also asserts that the four officers used excessive force in overcoming his resistance to the stomach-pumping procedure. Each allegation, and the summary judgment motion asserting qualified immunity, is addressed in turn.

### 1.      *The Claim that the Stomach Pumping was Unconstitutional*

"[C]laims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen [are] analyzed

24

under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Because Stokes was a pretrial detainee, the Fourth Amendment "reasonableness" standard applies to his unlawful search and seizure claim.  This court has previously held that Stokes had alleged the violation of a Fourth Amendment right by alleging that his stomach was pumped against his will after his arrest.[10]  Defendants' summary judgment motions assert qualified immunity from liability.

The summary judgment evidence, viewed in the light most favorable to Stokes, does not show that the stomach-pumping incident was itself unconstitutionally excessive force so as to be an improper search or seizure.  Stokes has not alleged or produced evidence that when the procedure was ordered, a reasonable officer would have believed that pumping the stomach of a pretrial detainee under the exigent circumstances presented here violated the detainee's constitutional rights.  The record shows that when Stokes's stomach was pumped over his objection, the officers and doctor reasonably believed that he had swallowed unwrapped rocks of crack cocaine; that his physical condition was deteriorating; that he was at increasing risk of bodily injury or even death if the drugs were not pumped out of his

---

[10] Stokes also claims that the officers and Dr. Luh violated his substantive due process rights by pumping his stomach against his wishes.  After *Graham,* "if a constitutional claim is covered by a specific constitutional provision, the claim must be analyzed under the standard appropriate to that specific provision, not under substantiative due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 833 (1998).  The more specific Fourth Amendment reasonableness standard applies to this postarrest, preconviction detention.  *Graham*, 490 U.S. 386.

system; and that he was exhibiting irrational behavior and appeared unable to decide whether to undergo the medical treatment.

The police officers and Dr. Luh have presented competent summary judgment evidence that when the stomach-pumping procedure was ordered, they reasonably believed that Stokes had swallowed crack cocaine; that he was experiencing symptoms of physical distress, including elevated blood pressure and accelerated heart rate; and that if he did not have the cocaine pumped out of his stomach, he could suffer serious injury or even die. (Docket Entry No. 56, Ex. I at 6; Ex. J at 3–4; Ex. K at 4–5; Ex. L at 4–6 ).  Stokes offers no evidence to controvert that the officers and doctor had  information that Stokes was suffering progressively worse symptoms consistent with cocaine ingestion and was at risk of physical injury.  The record also shows that Stokes was becoming increasingly disturbed, thrashing and flailing, screaming and yelling threats to the medical staff, making it reasonable for the officers and doctor to believe that he was incapable of making a rational decision as to his need for the medical procedure.

Stokes relies on cases finding that compelled medical procedures on pretrial detainees violate the Fourth Amendment when they are for the purpose of recovering evidence.  In *Rochin v. California,* 342 U.S. 165 (1952), the Supreme Court found forcibly pumping a suspect's stomach to obtain evidence unconstitutional.  In that case, the suspect had swallowed two capsules during an arrest.  His stomach was pumped against his will and the capsules were found to contain morphine.  The Court found that this "forcible extraction .

. . to obtain evidence" was unconstitutional.  In *Schmerber v. California,* 384 U.S. 757 (1966), the Supreme Court found no Fourth Amendment violation when an individual suspected of drunk  driving was forced to undergo a blood test to use the results as evidence in a subsequent criminal prosecution.   The Court held that the reasonableness of surgical intrusions beneath the skin depended on a case-by-case approach, weighing the individual's interests in  privacy and security against society's interests in conducting the procedure.  A critical factor is the extent to which the procedure itself might threaten the safety or health of the suspect.  The Court recognized that blood tests are not unduly intrusive and that the state had a great interest in using reliable evidence such as a blood test in determining guilt or innocence.  *Id.* at 771.  In *Winston v. Lee,* 470 U.S. 753 (1985), the Court applied the *Schmerber* balancing test to find that surgery, under a general anesthetic, to retrieve a bullet for use as evidence did violate the Fourth Amendment when the suspect refused to consent. The Court emphasized evidence in the record showing that there were medical risks of the operation and the absence of a demonstrated need for the bullet as evidence.  Applying these same factors, a court later found no violation in the surgical removal of a bullet from a suspect to use the bullet as evidence.  In *United States v. Crowder*, 543 F.2d 312, 316-317 (D.C. Cir. 1976)(en banc), the court relied on the following factors:  the evidence sought was relevant and could have been obtained in no other way; there was probable cause to believe that the operation would produce the evidence; the operation was minor and performed by a skilled surgeon with a minimal risk of permanent injury; and before the operation was

27

performed, the court held a hearing, after which the defendant was afforded an opportunity for appellate review.

The cases that Stokes cites do not involve the use of a compelled medical procedure to protect the suspect's health rather than to recover evidence. The Fifth Circuit has found it constitutional to force a suspect who swallowed heroin to have his stomach pumped, when the suspect appeared to be unconscious or semiconscious and the officers acted in good faith to prevent further harm to him. *United States v. Owens*, 475 F.2d 759, 760 (5th Cir. 1973). The Fifth Circuit emphasized that a forced stomach pumping to respond to medical need, rather than gather evidence, "bears no resemblance to *Rochin*." *Id.* In this case, as in *Owens,* the stomach pumping was ordered to respond to Stokes's medical needs, not to gather evidence for use in court. Moreover, the facts present here are consistent with one of the factors cited in *Winston*: concern for the life or health of the suspect.

Stokes cites other cases involving unwanted medical treatment.[11] He does not cite a case, such as *Owens*, in which the suspect was in imminent danger and unable to make potentially life-saving medical decisions. The cases Stokes cites do not address a state actor's decision to order a pretrial detainee to undergo a medical procedure for medical rather

---

[11]Stokes cites *Washington v. Harper,* 494 U.S. 210 (1990) (mentally ill prisoner)*; Riggens v. Nevada,* 504 U.S. 127 (1992) (defendant at trial); *Youngberg v. Romeo,* 457 U.S. 307 (1991) (involuntarily committed individual); *Vitek v. Jones,* 445 U.S. 480 (1980) (mentally ill prisoner); *Parham v. J.R.,* 442 U.S. 584 (1979) (mentally ill children committed by parents); *Whalen v. Roe,* 429 U.S. 589 (1977) (requiring state records of all drugs prescribed); *Cruzan v. Director, Missouri Department of Health,* 497 U.S. 261 (1989) (patient in vegetative state).

than investigative purposes, when the officers reasonably believed that the medical need was urgent and the detainee was incapable of making an informed decision.

In *Sullivan v. Bornemann*, 384 F.3d 372 (7th Cir. 2004), officers in a similar situation were found to have qualified immunity. The suspect had been arrested with drug paraphernalia and registered a very high breathalyser result, so high that the jail would not admit him. *Id*. at 373-74. Police officers took him to the hospital and helped medical personnel forcibly catheterize him to obtain a urine sample to measure his blood alcohol level. *Id*. at 374–75. The urine sample from the catheterization was not used as evidence. *Id*. at 374. The court held that the suspect "had no right to refuse treatment once he was arrested and transported to the emergency room." *Id*. at 378. *See also Williams v. Brann*, No. 02-C-940, 2006 WL 2401112, at *4 (E.D. Wis. Aug. 18, 2006) (a doctor who performed a rectal exam on a suspect believed to have ingested cocaine had qualified immunity for that decision); *United States v. Husband*, 226 F.3d 626, 631–33 (7th Cir. 2000) (considering whether police may use general anesthesia to recover evidence from the person of the defendant); *Sparks v. Stutler*, 71 F.3d 259, 261 (7th Cir. 1995) (determining that a catheter could be used to retrieve evidence from a prisoner under the Eighth Amendment); *State v. Lawson*, 453 A.2d 556, 558–59 (N.J. App. Div. 1982) (approving surgical bullet removal, even if general anaesthesia is required).

As an initial matter, summary judgment in favor of Sergeant Alcocer and Officers Gray and Pope is appropriate. The evidence shows that they did not order the stomach-

pumping procedure.  Lieutenant Porretto testified that he was the  one  responsible for ordering that Dr. Luh conduct the procedure. (Docket Entry No. 54, Ex. E at 35–36). The other officers testified consistently.  (Docket Entry No. 54, Ex. B at 26–26; Ex. F at 33–35; Ex. G at 21–23).  Dr. Luh testified that Lieutenant Porretto ordered him to pump Stokes's stomach.  Dr. Luh also testified that the medical procedure was necessary to save Stokes's life.  (Docket Entry No. 54, Ex. D at 3–4).

As to Lieutenant Porretto and Sergeant Alcocer, the evidence does not raise a fact issue as to whether they were objectively reasonable in ordering Dr. Luh to conduct the procedure,  given  the  information  available  and  the  circumstances  present.    Clearly established law required the police officers to provide Stokes with appropriate medical care. *See City of Canton v. Harris*, 489 U.S. 378 (1989); *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1020 (7th Cir.2003) (explaining that police officers "would have left themselves open to charges of due process violations for failure to provide appropriate medical care to a pretrial detainee").  As noted, the evidence shows that the officers reasonably believed that Stokes had swallowed cocaine.  Gray told the other officers that he had seen Stokes take what appeared to be crack rocks from a body cavity and swallow the drugs.  The officers were aware of Stokes's history of drug-related incidents.  (Docket Entry No. 54, Ex. A at 7–8; Ex. K at 2; Ex. L at 2).  The medical evidence shows that, at the time the decision was made to pump Stokes's stomach, he was exhibiting both irrational behavior and dangerous heart rate and blood pressure symptoms consistent with cocaine ingestion.

Although Stokes alleged that Lieutenant Porretto's decision to order Dr. Luh to pump his stomach was motivated by a desire to harm him or to find cocaine to use as evidence, the "reasonableness" Fourth Amendment inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Richardson*, 490 U.S. 386, 396 (1989) (citing *Scott v. United States*, 436 U.S. 128, 137–38 (1978); *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The record shows that the decision to order Stokes's stomach pumped was made to meet exigent medical needs rather than for law-enforcement purposes. The record shows that the decision was objectively reasonable, given the information about Stokes's medical condition, his irrational behavior, and the clearly established law requiring that pretrial detainees have their medical needs met. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

Dr. Luh did not immediately perform the procedure, but waited while monitoring Stokes's vital signs, which continued to degenerate. Before conducting the procedure, Dr. Luh administered a sedative so that the procedure would be as painless as possible. The present record shows that the drug was used to immobilize Stokes was only administered after his struggles made it clear that no alternative existed. The record also shows that the drugs used were short-acting and had only minor side effects.

31

Dr. Luh was treating a person who was in police custody, who was in grave danger, and who apparently lacked the ability to make judgments about his own medical treatment. Moreover, Lieutenant Porretto threatened to arrest Dr. Luh if he did not perform the procedure under his apparent authority.  Dr. Luh's action were objectively reasonable, and he is entitled to qualified immunity.

An objectively reasonable officer and doctor would not have known that ordering Stokes's stomach pumped violated a clearly established right.

> 2. *The Claim of Excessive Force Used to Overcome Stokes's Resistance to the Stomach-Pumping Procedure*

Stokes alleges that the four officers tied him to the hospital bed and that Officers Pope and Gray bent Stokes's hand and fingers back; Sergeant Alcocer applied pressure to Stokes's head; Officer Gray ground his fist under Stokes's chin; that Lieutenant Porretto  straddled Stokes and pressed his knees into Stokes's chest and groin; and that Sergeant Alcocer grabbed his testicles.  Stokes acknowledges that he was vigorously resisting the officers and the efforts by medical personnel to diagnose and monitor his medical condition and to administer medical treatment.  The evidence shows that the officers reasonably believed that Stokes had swallowed cocaine rocks and urgently needed to have his stomach pumped to prevent further absorption of the drug.  The issue is whether the clearly established law made it objectively unreasonable for the officers to use the amount and type of force employed to try to subdue Stokes.

32

Reviewing the record and allegations and considering them in Stokes's favor does not raise a fact issue as to whether Officers Pope or Gray used more force than was reasonably necessary to control Stokes so that the medical staff could evaluate and provide what the officers reasonably believed was urgently needed medical treatment. The evidence showed that at the nurse's instruction, Officer Gray tried to pry Stokes's mouth open to allow the medical staff to insert a tube. The evidence showed that Stokes slightly cut his mouth, a *de minimis* injury, after which Gray stopped that effort. Stokes alleged that Officer Pope bent Stokes's fingers and hands, trying to overcome Stokes's prolonged and vigorous struggle. Pope disputes that he did so, but taking the allegations and evidence in the light most favorable to Stokes does not preclude summary judgment because the record does not show any hand or finger injury as a result. *Cf. Harper*, 21 F.3d at 600; *Johnson*, 876 F.2d at 479–80. Officer Pope's and Officer Gray's motions for summary judgment on the claim that they used excessive force at the hospital are granted.

The summary judgment evidence shows that during the struggle, Lieutenant Porretto climbed on top of Stokes and straddled his body, pressed his knees down on Stokes's stomach and groin, and, when Stokes's thrashing threatened to throw Porretto off, grabbed Stokes's genitals and squeezed. Although Stokes believed that Sergeant Alcocer was the one who grabbed his genitals, all the officers testified that it was Lieutenant Porretto who did so. Stokes agreed that Porretto might have been the one. Stokes testified that he felt extreme pain from the force Porretto exerted.

Stokes asserts that Porretto's actions were malicious in that they were solely intended to produce pain.  Stokes acknowledges that when Porretto climbed on top of him, he was continuing to struggle and flail and thrash about, yelling and screaming at the hospital and law enforcement personnel, and resisting treatment that the officers reasonably believed was medically necessary.  These circumstances made it objectively reasonable for the officers to take steps to subdue Stokes.  But Porretto's alleged efforts to subdue Stokes included not merely climbing on top of him when he was tied to the bed, but also pressing his knees into Stokes's stomach and groin and grabbing and squeezing Stokes's testicles.  According to Porretto, during the struggle, Porretto grabbed, but did not squeeze, Stokes's testicles to prevent being "bucked off."  (Docket Entry No. 54, Ex. E at 21–22).  According to Alcocer, Porretto squeezed Constant's testicles for "several seconds," but Alcocer did not know how much pressure Porretto applied.  (Docket Entry No. 54, Ex. G at 25).  According to Stokes, while Porretto was pressing down on him using his knees, Stokes's testicles were squeezed hard, causing extreme pain. Taking Stokes's allegations as true for the purpose of this motion, these last steps were taken to deliberately inflict extreme pain.  Stokes has asserted a cognizable injury for the purpose of the qualified immunity analysis. *Williams*, 180 F.3d 699; *Tarver*, 410 F.3d at 752 (citing *Flores v. City of Palacios*, 381 F.3d 391, 400–01 (5th Cir. 2004)).  Stokes has presented a fact issue as to whether, under the circumstances, it was objectively reasonable for Porretto to grab and squeeze his genitals and to press his knees down on Stokes's stomach and groin with his full body weight, or whether such force was unreasonably excessive.  Porretto's motion for summary judgment on this claim is denied.

As to Sergeant Alcocer, the summary judgment evidence does not raise a fact issue as to whether he used excessive force against Stokes in the hospital. Stokes testified that he thought Alcocer was the one who squeezed his testicles, but the officers all testified that Porretto was the one to do so, and Stokes acknowledged that he was not sure whether it was Alcocer rather than Porretto. The only other evidence as to Alcocer is from Blake, a former employee, who testified that he saw a Hispanic officer get on top of Stokes. Blake testified that when he saw this, Stokes was unconscious, without an IV, and alone in the room except for a nurse. The evidence shows that when Stokes was unconscious, he had an IV connected and the officers and Dr. Luh were present. Blake's testimony is insufficient to raise a fact issue as to whether Sergeant Alcocer used excessive force against Stokes in the hospital. Sergeant Alcocer's motion for summary judgment is granted.

### 3.    The Supervisory Liability Claim

Stokes alleges that Lieutenant Porretto and Sergeant Alcocer failed to control their subordinates, Officers Pope and Gray, in violation of his rights. The supervisory officers have moved for summary judgment on this claim.

An individual officer cannot be held liable under section 1983 on the basis of *respondeat superior*. *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997). "Rather, the misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor." *Id.* (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (*en banc*)). "[M]ere proof that the injury could have been prevented if the officer had received better or additional training cannot, without more, support liability."

*Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005).  "[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective."  *Id.*  (citing *Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992)).

The record precludes a finding of supervisory liability against Sergeant Alcocer, as a matter of law.  The evidence shows no basis to conclude that Sergeant Alcocer was involved in or contributed to Officer Gray's use of force against Stokes during the strip-search.  After Officer Gray informed Sergeant Alcocer that Stokes had swallowed drugs in the lock-up, Sergeant Alcocer contacted an assistant district attorney, who advised him to take Stokes to the hospital.  Sergeant Alcocer, relying on this advice, told Officer Gray to do so and asked Officer Pope to accompany him.  Sergeant Alcocer also went to the hospital. When Stokes refused consent for treatment, Sergeant Alcocer went up the chain of command to Lieutenant Porretto, who came to the hospital himself.   This court has granted summary judgment dismissing Stokes's excessive force claims against Officers Gray and Pope for their conduct at the hospital.

Nor has Stokes raised a fact issue as to his supervisory liability claim against Lieutenant Porretto.  The summary judgment evidence, taken in the light most favorable to Stokes, shows no indication that Lieutenant Porretto was involved in or contributed to cause Officer Gray's conduct toward Stokes at the lock-up.  With respect to the events at the hospital, although this court has found that fact issues preclude summary judgment as to Lieutenant Porretto's own actions in attempting to restrain Stokes, those actions did not

36

involve his supervision of other officers.  This court has granted summary judgment as to the claim that Sergeant Alcocer, Officer Gray, and Officer Pope used excessive force against Stokes at the hospital.  Even if fact issues were present as to Sergeant Alcocer's and Lieutenant Porretto's supervision of the other officers, they would be entitled to qualified immunity as to supervisory liability because the steps the subordinate officers took in their presence were themselves objectively reasonable.

This court grants Alcocer's and Porretto's motion for summary judgment as to Stokes's claim that they are liable for failing to supervise Officers Gray and Pope at the hospital.

### 4.    The Failure to Intervene Claim

Stokes alleges that the nonsupervisory officers, Officers Gray and Pope, "should have intervened to prevent the illegal acts from occurring."  (Docket Entry No. 37, ¶ 27.D).   A plaintiff may raise a failure-to-intervene claim if a police officer is present at a scene, knows that a fellow officer is violating the plaintiff's constitutional rights, has a reasonable opportunity to prevent the harm, and chooses not to act.  *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).  "[T]he officer must have had a reasonable opportunity to realize the excessive nature of the force and a reasonable opportunity to intervene and stop it."  *Nowell v. Adadian Ambulance Serv.*, 147 F. Supp.2d 495, 507 (W.D. La. 2001).

Stokes contends that Officers Gray and Pope should have prevented Lieutenant Porretto and Sergeant Alcocer from using excessive force.  Officers Gray and Pope respond that they did not have time to apprehend that Lieutenant Porretto or Sergeant Alcocer were

37

using excessive force against Stokes or a reasonable opportunity to prevent it.   (Docket Entry No. 55 at 43).  This court agrees.

The record shows that, as a matter of law, Sergeant Alcocer did not use excessive force in participating in the efforts to restrain Stokes and overcome his resistance to medical treatment.   The record shows that, as a matter of law, neither Lieutenant Porretto nor Sergeant Alcocer engaged in prolonged or systematic use of excessive force.  Rather, the fact issues as to Lieutenant Porretto's use of force arise from the brief and chaotic series of events, consisting of Porretto straddling Stokes on the bed, kneeing him, and momentarily squeezing his testicles.  These events did not give Pope or Gray a reasonable opportunity to apprehend the nature or extent of the force used or to stop further actions.  For the same reasons, their failure to intervene was objectively reasonable, entitling them to qualified immunity.   Officers Gray's and Pope's motion for summary judgment for the failure to intervene claim is granted.

### C.    The Equal Protection Claim

In his Amended Complaint, Stokes alleged that the officers "worked to deprive Plaintiff of . . . equal protection of the laws, or of equal privileges and immunities under the law and was tainted with racial hatred contrary with the laws in which the officers are required to enforce."  (Docket Entry No. 37, ¶ 27).[12]  These claims appear to be based on

---

[12]  Stokes has not identified any freestanding "privileges and immunities" claim applicable to this case.

Officer Gray's alleged use of racial epithets.  The officers moved for summary judgment on this claim.  Stokes did not specifically respond to this part of the motion.

"The Constitution does not tolerate intentional police harassment of racial minorities." *Johnson v. Morel*, 876 F.2d 477, 479 (5th Cir. 1989) (en banc), *abrogated on other grounds by Harper v. Harris County*, 21 F.3d 597 (5th Cir. 1994).  In *Williams*, the Fifth Circuit rejected an equal protection claim based on the officer's alleged use of racial epithets, noting that "an officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation." *Williams*, 180 F.3d at 706.  A later panel of the Fifth Circuit explained that "we have impliedly held that racial epithets that accompany harassment or a violation of established rights may amount to a separate equal protection violation."  *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003) (citing and discussing *Williams,* 180 F.3d 699) (emphasis removed);  *Johnson v. Johnson*, 385 F.3d 503, 531 n.20 (5th Cir. 2004).

Stokes's only plausible equal protection claim lies against Officer Gray.  Stokes has not alleged that any of the other officers used racial epithets.  Stokes did allege, however, that Officer Gray referred to him as a "nigger" several times after the strip-search and use of force.  This court has granted Officer Gray's motion for summary judgment as to all Stokes's claims except as to the excessive force claim based on alleged blows to the head.  The record does not present a sufficient basis for a reasonable jury to find an equal protection violation. *Compare Johnson v. Johnson*, 385 F.3d at 530 ( plaintiff pointed to evidence that he was not only subject to discriminatory epithets, but also that "he qualified for safekeeping status but

39

was treated differently than other vulnerable inmates because of his sexual orientation."); *Martin v. City of San Antonio*, No. SA-05-CA-0020-XR, 2006 WL 2062283, *8–9 (W.D. Tex. July 25, 2006) (combining alleged use of racial epithets with a clearly unconstitutional search to find a fact issue on an equal protection claim).  The officers' motion for summary judgment on the equal protection claim is granted.

### D.    The Conspiracy Claim

In his Amended Complaint, Stokes asserted a conspiracy cause of action against all four officers.  (Docket Entry No. 37, ¶ 27.E).  Section 1983 claims must be based on violations of federal law or the constitution by state and municipal officers.  There is no freestanding conspiracy claim available under § 1983.  *Cf. Murray v. Earle*, 405 F.3d 278, 293 (5th Cir. 2005) (addressing a § 1983 claim for Fifth Amendment violations and a pendent state-law civil conspiracy claim).  Because this court has granted summary judgment as to the claims against all but one officer at the hospital, the conspiracy claim fails as a matter of law.  The defendants' motion for summary judgment on the conspiracy claim is granted.

## IV.    Conclusion

Dr. Luh's motion for summary judgment is granted as to all claims.  Officer Pope's motion for summary judgment is granted as to all claims.  Sergeant Alcocer's motion for summary judgment is granted as to all claims against him.  Officer Gray's motion for summary judgment is granted as to the claims involving his conduct at the hospital and denied as to the claim that  he used excessive force when he struck Stokes on the head twice

with a baton at the lock-up.  Lieutenant Porretto's motion for summary judgment is granted as to all the claims against him except the claim that he used excessive force when he kneed Stokes in the stomach and groin and squeezed his genitals.  The partial denials of summary judgment as to qualified immunity are based on disputed historical facts material to determining what force was used and whether it was excessive.  This court does not deny summary judgment based on a finding of law that qualified immunity does not apply.

A pretrial conference to establish a scheduling order to resolve the remaining issues will be held on **October 10, 2006, at 5:00 p.m.**

SIGNED on September 29, 2006, at Houston, Texas.

Lee H. Rosenthal
United States District Judge